In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1703

ABRE JACKSON,

*Plaintiff-Appellant,*

*v.*

MARC T. ANASTASIO, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-06004 — **Sara L. Ellis**, *Judge.*

———————————

ARGUED APRIL 2, 2024 — DECIDED AUGUST 25, 2025

———————————

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Abre Jackson is a prisoner in Illinois. After a physical altercation with several prison guards and a prison disciplinary hearing, he was placed in disciplinary segregation, more commonly known as solitary confinement, for three months. This appeal is the latest in a series that have required us to consider when prisoners' disciplinary placements in solitary confinement amount to deprivations of a liberty interest protected by procedural

due process, as well as the extent of process that may be due. The answer depends on the combination of the length of solitary confinement and the actual conditions of that confinement as compared to those the prisoners would otherwise experience.

The district court granted summary judgment for the defendant prison officials, finding that they did not deprive Jackson of a liberty interest by placing him in solitary confinement for three months despite Jackson's evidence describing appalling conditions in the solitary cell. On that question, we respectfully disagree with the district court, but we affirm the judgment for defendants. Even if a trial were to establish that Jackson was deprived of a liberty interest, defendants would still be entitled to qualified immunity from any damages remedy because the applicable law was not clearly established at the time they ordered him into solitary confinement.

I.  *Factual and Procedural History*

   A. *The Incident at Stateville & the Adjustment Committee Hearing*

Because we are reviewing a grant of summary judgment, we give Jackson as the non-moving party the benefit of conflicts in the evidence and draw all favorable inferences from it. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013). On February 25, 2020, Jackson was incarcerated at Stateville Correctional Center. A correctional officer approached Jackson's cell to close its "chuckhole," a small opening just large enough for Jackson to reach both of his arms through. As the officer reached for the chuckhole door, Jackson placed one arm through the opening. A second guard then approached and tried to help close the door. Jackson testified that one of the

officers grabbed his arms and banged them against the cell door and that another guard forcefully bent his finger. Video footage depicts one officer grabbing Jackson's arm, but a guard's body obscures most of the rest of the interaction. A few seconds later, a third correctional officer, defendant Marc Anastacio, approached the cell, shaking a chemical agent in his right hand. Jackson asserts that Anastacio ground the spray canister into Jackson's hand.

About thirty seconds later, a fourth correctional officer, defendant Shadi Awad, approached the cell door and began speaking to the other officers. Jackson recalls that Awad alerted them to the presence of a camera and told them to stop. Moments later, Jackson broke free of the officers. Anastacio then discharged a chemical agent into Jackson's cell. Jackson says that Anastacio continued spraying the chemical agent at Jackson even after he had retreated completely into his cell. Defendants dispute this, and the video evidence does not conclusively resolve the dispute. The entire interaction lasted just over one minute, until a correctional officer secured the chuckhole door.

Within just hours of the incident, Jackson was transferred from Stateville to the Pontiac Correctional Center. Jackson testified that he received medical treatment for his resulting injuries at Stateville before transfer and at Pontiac afterwards.

Based on the chuckhole incident at Stateville, Anastacio issued Jackson a disciplinary ticket for a major infraction. That ticket triggered an "adjustment hearing" for Jackson at Pontiac. The hearing was conducted on March 13, 2020 by a committee of two, defendants Travis Bantista and Jesus Madrigal. At the hearing, Jackson was permitted to ask questions and to tell his side of the story, but he was not allowed to call

witnesses or to view the video of the incident. After the hearing, the committee issued its recommended disciplinary measures along with the reasons for its decision, which was based on statements by the Stateville guards. The recommended discipline included the loss of one month of good-time credit; three- or six-month losses of in-person visitation, commissary access, and other privileges; and most relevant to this appeal, three months of disciplinary segregation, which we also call solitary confinement. Pontiac's warden, defendant Leonta Jackson, approved the hearing committee's determination.[1]

B.  *Procedural History*

Jackson filed this suit under 42 U.S.C. § 1983, claiming in relevant part that Bantista, Madrigal, and Warden Jackson (collectively, "the Pontiac defendants") violated his Fourteenth Amendment rights by sentencing him to disciplinary segregation without sufficient process. The defendants moved for summary judgment on several grounds, including failure to establish a protected liberty interest, failure to show

---

[1] Jackson's good-time credits were later restored, and for good reason. Revoking a prisoner's good-time credits without permitting him to call witnesses violates the Supreme Court's holding in *Wolff v. McDonnell*, at least when calling witnesses would not be "unduly hazardous to institutional safety or correctional goals." 418 U.S. 539, 566–67 (1974); see also *Donelson v. Pfister*, 811 F.3d 911, 917 (7th Cir. 2016) ("Due process requires that prisoners in disciplinary proceedings, before being deprived of good time, be allowed to call witnesses and present other evidence." (citing *Wolff*, 418 U.S. at 566)). Restoring the good-time credits, however, is a sufficient remedy for such a procedural error. See *Adams v. Reagle*, 91 F.4th 880, 896 (7th Cir. 2024) (majority opinion of St. Eve, J., on procedural due process issue). We need not discuss the good-time credits further.

that the procedures afforded in his hearing were inadequate, and qualified immunity.[2]

The district court granted defendants' summary judgment motion as to Jackson's procedural due process claim, finding that Jackson could not establish that defendants deprived him of a liberty interest subject to the due process requirements of the Fourteenth Amendment by forcing him into three months of segregation. *Jackson v. Vasquez*, No. 20 C 6004, 2023 WL 319530, at *7 (N.D. Ill. Jan. 18, 2023). The court first concluded that the length of Jackson's segregation, three months, was insufficient to create a liberty interest standing alone. *Id.* at *6. But it also recognized that Jackson could still establish he was deprived of a liberty interest if the segregation caused him to suffer "unusually harsh conditions of confinement or additional punishments…." *Id.*, citing *Kervin v. Barnes*, 787 F.3d 833, 836–37 (7th Cir. 2015).

Jackson provided evidence that the conditions of his segregation were indeed unusually harsh. In a declaration opposing defendants' motion for summary judgment, Jackson asserted that his disciplinary segregation cell, unlike Pontiac's general population area, had feces and urine on the walls, constant noise with inmates banging on cell doors, water contaminated with bacteria that causes Legionnaire's disease, and roaches and mice. He also said that inmates in the disciplinary segregation cells, unlike inmates in general

---

[2] Jackson also alleged the Stateville guards used wanton and unnecessary force in violation of the Eighth Amendment. A jury rendered a verdict against defendant Anastacio for $2,500 in compensatory damages and $5,000 in punitive damages. That claim is not at issue in this appeal.

population, throw feces and urine at other inmates when they are in the hallways. *Jackson*, 2023 WL 319530, at *6.

Comparing the conditions of solitary confinement as testified by Jackson to conditions considered in previous cases, the district court found that "when coupled with his relatively short segregation time, he has not sufficiently raised a genuine issue of material fact regarding whether he suffered" the sort of "atypical and significant hardship" required to establish a liberty interest protected by procedural due process. *Id.* at *7; see generally *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (adopting "atypical and significant hardship" standard for finding protected liberty interest). Because Jackson failed to raise a genuine dispute of material fact regarding the existence of a liberty interest, the district court granted defendants' motion for summary judgment on the merits of Jackson's due process claim without reaching the defense of qualified immunity. This appeal followed.[3]

II.  *Analysis*

We review de novo a district court's grant of summary judgment on the ground that the plaintiff was not deprived of a liberty interest. *Thomas v. Ramos*, 130 F.3d 754, 759 (7th Cir. 1997). We explain first why Jackson has raised a genuine issue of fact about whether he was deprived of a protected liberty interest. Our explanation of the applicable law will lay the foundation for our decision on qualified immunity because any transgression of Jackson's due process rights did not violate clearly established law.

---

[3] We thank Abigail R. Van Hook, Terrence P. Canada, and the law firm now known as Troutman Pepper Locke LLP for their capable service to plaintiff Jackson and to the district court and this court.

A.  *The Two-Prong Qualified Immunity Framework*

Qualified immunity aims to strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties …." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted), quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984). To determine whether qualified immunity shields the actions of public officials, "the courts employ a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred." *Hardaway*, 734 F.3d at 743, citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We have discretion to address the two qualified immunity prongs in whichever order is appropriate. We may use that discretion to resolve step-one rights questions first, especially when avoiding them would "leave standards of official conduct permanently in limbo." S*mith v. Kind*, 140 F.4th 359, 365 (7th Cir. 2025) (internal quotation marks omitted), quoting *Camreta v. Greene*, 563 U.S. 692, 706 (2011).

In *Camreta*, the Supreme Court explained that such step-one merits rulings

> are not mere dicta or 'statements in opinions.' They are rulings that have a significant future effect on the conduct of public officials—both the prevailing parties and their co-workers— and the policies of the government units to which they belong. And more: they are rulings self-consciously designed to produce this effect, by establishing controlling law and preventing invocations of immunity in later cases. And still

more: they are rulings designed this way with this Court's permission, to promote clarity— and observance—of constitutional rules.

563 U.S. at 704–05 (citations omitted), quoting *California v. Rooney*, 483 U.S. 307, 311 (1987).

Whether and when solitary confinement deprives a prisoner of a protected liberty interest has been and will continue to be a difficult problem for courts, so qualified immunity often applies even where a prisoner's rights have been violated. E.g., *Hardaway*, 734 F.3d at 744 (affirming grant of qualified immunity and agreeing with district court that liberty interest issue "is not at all clear except at the fringes"). We therefore address the first prong on the merits without skipping ahead to the "clearly established law" question.

As instructed by *Camreta*, we have repeatedly thought hard about whether to decide the merits issue presented in this appeal, when solitary confinement affects a protected liberty interest. See 563 U.S. at 707. In *Hardaway*, more than a decade ago, we explained that while district courts "would benefit from a bright-line rule on the types of conditions and durations of segregation [that] give rise to a prisoner's liberty interest, no such guidance has yet to be specifically addressed by this Court." 734 F.3d at 745. We are still unable to set out a bright-line rule for solitary confinement cases, but this case is "one of those cases in which it is appropriate for the court to exercise its discretion to avoid avoidance." *Toevs v. Reid,* 685 F.3d 903, 910 (10th Cir. 2012) (deciding first prong of qualified immunity in case concerning prisoner's procedural due process right to periodic review of prolonged administrative segregation).

B. *Violation of a Constitutional Right*

We first ask whether the plaintiff has shown a violation of a constitutional right—or to be more precise, whether he has offered evidence that would allow a reasonable jury to find that he suffered a violation of a constitutional right. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled in part on other grounds by *Pearson*, 555 U.S. at 236. We note that this appeal does not present the closely related questions of whether and when conditions of solitary confinement amount to cruel or unusual punishment under the Eighth Amendment, regardless of procedures used to impose those conditions.

1. *Liberty Interests in Avoiding Disciplinary Segregation*

Prisoners may "claim the protections of the Due Process Clause. They may not be deprived of life, liberty or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). To proceed on a due process claim, a prisoner must demonstrate: "(1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient." *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019).

In *Wolff*, the Supreme Court held that a prisoner is entitled to limited procedural protections before he is deprived of his liberty interest in good-time credits as a disciplinary measure. 418 U.S. at 556–57. The *Wolff* Court also taught that those constitutional safeguards should apply when inmates face disciplinary solitary confinement:

> The deprivation of good time and imposition of 'solitary' confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for *it would be diffi-cult for the purposes of procedural due process to*

> *distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue*. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. *Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction.*

*Id.* at 571 n.19 (emphases added).

After *Wolff*, two Supreme Court decisions directly addressed whether and when assignment to some form of segregation or solitary confinement could deprive a prisoner of a liberty interest that would trigger due process protections: *Wilkinson v. Austin*, 545 U.S. 209 (2005), and *Sandin v. Conner*, 515 U.S. 472 (1995). See *Marion v. Columbia Correctional Institution*, 559 F.3d 693, 697 (7th Cir. 2009) (summarizing *Wilkinson* and *Sandin*). In *Sandin*, the Supreme Court held that thirty days of disciplinary segregation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486. In *Wilkinson*, prisoners were assigned to a maximum-security prison, placed in segregated confinement for an indefinite duration, and "deprived of almost any environmental or sensory stimuli and of almost all human contact." 545 U.S. at 214. The Supreme Court wrote that although "any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

As we have explained, "*Sandin* and *Wilkinson* establish that disciplinary segregation *can* trigger due process protections depending on the duration and conditions of segregation." *Marion*, 559 F.3d at 697. In addition, "we have declined to read *Wilkinson*'s holding as being limited to its specific facts." *Id.* We must therefore analyze "the combined import of the duration of the segregative confinement *and* the conditions endured by the prisoner during that period" to determine whether solitary confinement deprives a prisoner of a liberty interest warranting due process protections. *Id.* A liberty interest may arise "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." See *id.* at 697–98.

There is a lot of room between the thirty days of solitary confinement in *Sandin* and the indefinite, near-total sensory deprivation in *Wilkinson*. The Supreme Court has left it to lower courts to chart that territory. Our cases have emphasized continued sensitivity to stints in solitary confinement measured in months. E.g., *Ealy v. Watson*, 109 F.4th 958, 964–65 (7th Cir. 2024) (assuming liberty interest implicated by five months in disgusting solitary conditions); *Marion*, 559 F.3d at 698–99 & n.3 (roughly eight months of solitary confinement required remand for factual inquiry into liberty interest; collecting cases remanding where solitary confinement lasted as few as 75 days).

But the combination of qualified immunity's "clearly established" requirement layered on top of the multi-factor approach from *Sandin* and *Wilkinson* means that for any term of solitary confinement lasting more than days but less than years, qualified immunity will often apply to claims for damages. E.g., *Hardaway*, 734 F.3d at 745. For segregation terms

measured in months, even if an inmate's segregation amounted to a deprivation of a liberty interest, it is unlikely that prison officials could be "held responsible for incorrectly guessing otherwise due to the ambiguity of the parameters of the law." *Id.*

### 2. *The Value of a Duration-Based Rule*

The *Sandin*, *Wilkinson*, and *Marion* line of cases requires us to consider both "the duration of the segregative confinement *and* the conditions endured." *Marion*, 559 F.3d at 699. It is important to emphasize that the significance of unusually appalling physical conditions diminishes when courts confront prolonged terms of segregation. When a "prisoner is subjected to a lengthy period of segregation, the duration of that confinement itself may be atypical and significant." *Marion*, 559 F.3d at 699 n.4 (internal quotation marks omitted), quoting *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006).

*Marion* recognized that a long term of solitary confinement might suffice by itself to trigger a liberty interest. "Indeed, other courts of appeals have held that periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." *Id.* at 698–99 & n.4, citing *Iqbal v. Hasty*, 490 F.3d 143, 161 (2d Cir. 2007) (segregation of 305 days or more necessarily implicates liberty interest), overruled on other grounds sub nom. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Trujillo,* 465 F.3d at 1225 (reversing dismissal of claim involving 750 days' solitary); *Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (assuming that one year implicates liberty interest); see also *Brown v. Oregon Dep't of Corrections*, 751 F.3d 983, 988 (9th Cir. 2014) (twenty-seven months of disciplinary segregation sufficed to implicate liberty interest); *Perry v. Spencer*, 94 F.4th 136, 159–60 (1st Cir.

2024) (en banc) (same for fifteen months of administrative segregation); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (same for 305 days).[4]

We have not yet affirmatively adopted any minimum duration of disciplinary segregation that automatically implicates a liberty interest, regardless of other conditions of confinement. But some of our precedents have outlined durations that will *not* suffice by themselves—that is, without also showing that the conditions of the confinement were atypically harsh. For instance, we held in *Bryan v. Duckworth* that a year in disciplinary segregation required remand to determine whether "conditions in segregation were considerably harsher than those of the normal prison environment." 88 F.3d 431, 433 (7th Cir. 1996), abrogated on other grounds as recognized by *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998). Similarly, in *Wagner v. Hanks*, we held that a year in solitary confinement *could* implicate a liberty interest, but we

---

[4] In *Colon*, the Second Circuit held that more than 305 days in solitary confinement implicates a liberty interest and that durations between 101 and 305 days require the development of a detailed factual record. 215 F.3d at 231–32. In subsequent decisions, the Second Circuit has outlined a test akin to burden-shifting, where durations longer than approximately six months shift the burden of proving "typicality" back onto the officials seeking qualified immunity. See, e.g., *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) ("confinement of 188 days is a significant enough hardship" to create a liberty interest "[i]n the absence of factual findings to the contrary"). In *Perry v. Spencer*, 94 F.4th 136 (1st Cir. 2024) (en banc), the First Circuit adopted this burden-shifting approach in a case involving administrative segregation. That court noted that "fifteen months of solitary confinement" would suffice to establish a liberty interest "in the absence of the defendants making any contrary showing regarding the frequency of use of such prolonged solitary confinement for administrative reasons." *Id.* at 159.

flagged issues with defining the relevant comparison group when assessing whether such conditions were "atypical." 128 F.3d 1173, 1174, 1177 (7th Cir. 1997). The reasoning of those cases implies that a year in segregation does not automatically implicate a prisoner's liberty interest. We have reached more explicit conclusions on shorter periods of segregation. See, e.g., *Marion*, 559 F.3d at 698 ("six months of segregation is 'not such an extreme term' and, standing alone, would not trigger due process rights"), quoting *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995); *Lisle*, 933 F.3d at 721 (same for four months); *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (same for 90 days).

In reasoning that solitary confinement of up to one year, standing alone, is not sufficient to implicate a liberty interest, *Bryan* and *Wagner* probably lie close to the outer limit under current law. A one-year threshold is consistent with our recognition in *Marion* that other circuits have held that "periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." 559 F.3d at 699 (footnote omitted). It is also roughly consistent with the First Circuit's fifteen-month threshold adopted in *Perry*, 94 F.4th at 159, and the Second Circuit's 305-day boundary adopted in *Colon*, 215 F.3d at 231.[5]

Long terms of solitary confinement are not necessarily unconstitutional, at least not yet. But they call for at least some due process protections that apply when prison discipline

---

[5] For reasons addressed in the separate concurring opinion, we and other courts may find in the foreseeable future that we need to adopt a much shorter presumptive limit based on evolving research on the effects of prolonged solitary confinement, as well as international norms and domestic legal trends.

deprives a prisoner of a liberty interest. See generally *Wolff*, 418 U.S. at 556–58 & 571 n.19.

### 3. *Jackson's Evidence of a Protected Liberty Interest*

Jackson's assignment to solitary confinement was for three months, so whether he was deprived of a liberty interest depends, under *Marion*, on "the combined import of the duration of the segregative confinement *and* the conditions endured by [him] during that period." See 559 F.3d at 697.

Jackson has raised a genuine issue of material fact as to whether his segregation at Pontiac was an "atypical or significant hardship in relation to the ordinary incidents of prison life" under *Sandin*. 515 U.S. at 484. Jackson swore in an affidavit that his disciplinary segregation cell, unlike Pontiac's general population cells, had feces and urine on the walls, constant noise with inmates banging on cell doors, water contaminated with bacteria that causes Legionnaire's disease, and roaches and mice. He also testified that inmates in the disciplinary segregation cells, unlike inmates in general population, throw feces and urine at other inmates. *Jackson*, 2023 WL 319530, at *6. On a motion for summary judgment, we find it reasonable to infer in Jackson's favor that he personally experienced the deplorable conditions he described in his declaration opposing summary judgment.

When considering a prisoner's liberty interest in avoiding conditions of segregation, we have distinguished between allegations of "disgusting conditions" versus conditions that "although restrictive, were not unsanitary or otherwise disgusting." See *Kervin*, 787 F.3d at 836, citing *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997), and *Hatch v. District of Columbia*, 184 F.3d 846, 858 (D.C. Cir. 1999). Similarly, in *Taylor v.*

*Riojas*, which summarily reversed qualified immunity for prison officials, the Supreme Court held that "no reasonable correctional officer could have concluded that" it was constitutional under the Eighth Amendment to house a prisoner for six days in "deplorably unsanitary conditions." 592 U.S. 7, 7–9 (2020). While the Eighth Amendment question in *Taylor* is different from the Fourteenth Amendment question presented in this case, the summary reversal in *Taylor* reinforced the principle that prison officials do not have unlimited discretion to confine inmates in deplorable conditions.

While the conditions described by Jackson are not quite as awful as those in *Taylor*, the Pontiac cell block described in Jackson's affidavit was unequivocally "disgusting," *Kervin*, 787 F.3d at 836, and his assignment to solitary confinement there lasted fifteen times longer than the plaintiff's confinement in *Taylor*. The unsanitary conditions Jackson describes were far worse, and were described more specifically, than the "vague description of [the plaintiff's] cell, including rust on the bars and 'corroded feces' in the toilet" that we found insufficient to implicate a liberty interest in *Lisle*, 933 F.3d at 721 (combined with four-month term in solitary).

Jackson presents facts similar to those in *Ealy v. Watson*. The prisoner-plaintiff in *Ealy* was placed in segregation for five months and was confined in several cells, including one with bugs and spider webs, a lack of heat, and faulty plumbing "such that other inmates' waste flowed up into [his] toilet, causing foul odors." 109 F.4th at 963. We declined to decide expressly whether those conditions implicated Ealy's liberty interests. We assumed that they did and instead resolved the case on the ground that "Ealy received the process he was due." *Id.* at 966–67. Our assumption in *Ealy* provides support

for the idea that segregation for a matter of months in repulsive and unsanitary conditions can deprive a prisoner of protected liberty. We intend to make that explicit today.

A reasonable jury could conclude that the combined effects of Jackson's three-month assignment to disciplinary segregation and the conditions of his segregation imposed what *Sandin* called "an atypical and significant hardship." 515 U.S. at 484. If so, then Jackson was deprived of a liberty interest entitling him to the "minimum procedures appropriate under the circumstances" to ensure the "protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 557, 558. He argues that he did not receive those procedures before this punishment was imposed. We do not decide that issue because, as we explain next, the defendants are entitled to qualified immunity on the liberty interest question.

C. *Whether Defendants Violated Clearly Established Law*

For the second prong of qualified immunity, we assume Jackson can prove he was deprived of a liberty interest. The question is whether the defendants violated law that was clearly established at the time they imposed this term of solitary confinement. The answer is no. Jackson fails to meet his burden on the second prong of qualified immunity, and defendants are entitled to summary judgment on his due process claim.

"The affirmative defense of qualified immunity protects government officers from liability for actions taken in the course of their official duties if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hardaway*, 734 F.3d at 743, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To defeat qualified immunity by showing that a constitutional right is "clearly established," see *Harlow*, 457 U.S. at 818, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Jackson "bears the burden of identifying 'case law that has both articulated the right at issue and applied it to the factual circumstance similar to the one at hand.'" *Hardaway*, 734 F.3d at 744, quoting *Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007). This "clearly established" requirement holds even where the constitutional merits depend on "fact-specific" questions. *Anderson*, 483 U.S. at 640–41. In sufficiently obvious cases of constitutional violations, however, qualified immunity will not be available even in the absence of a factually close precedent. *Hope v. Pelzer*, 536 U.S. 730 (2002).

Under our case law at the time of Jackson's hearing in 2020, for almost any term of disciplinary segregation measured in months, consideration of the conditions of confinement was required to determine whether a liberty interest existed. In *Marion*, we noted that six months of segregation, again standing alone, would not trigger due process rights. 559 F.3d at 698. And in *Kervin*, we cautioned that a liberty interest could be established for terms of segregation less than six months "depending on the conditions of confinement and on any additional punishments." 787 F.3d at 836–37; see also *Hardaway*, 734 F.3d at 743 ("Although relatively short terms of segregation rarely give rise to a prisoner's liberty interest, at least in the absence of exceptionally harsh conditions, such an interest *may* arise from a long term of confinement combined with atypical and significant hardships."); *Ealy*, 109 F.4th at 964 ("five months in segregation, standing alone, is not enough to implicate a liberty interest").

Because the duration of Jackson's disciplinary segregation, three months, is not long enough to deprive him of a liberty interest on its own, defeating a qualified immunity defense required Jackson to show that violations have been established under "facts not distinguishable in a fair way from the facts presented in the case at hand." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016), quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001), abrogated on other grounds by *Pearson*, 555 U.S. 223. Put another way, the question is whether the defendant members of Jackson's disciplinary committee should have known they needed to provide him due process protections. See *Hardaway*, 734 F.3d at 744.

Jackson acknowledges this is not an easy task. He notes in his brief that "this Court has yet to establish clear standards for how harsh conditions in segregation need to be to satisfy the *Sandin* hardship analysis." Appellant's Br. at 9. Our comment over a decade ago in *Hardaway* remains true: the jurisprudence regarding what presents "an atypical and significant hardship" is "not at all clear except at the fringes." 734 F.3d at 744 (internal quotation marks omitted), quoting *Hardaway v. Meyerhoff*, No. 10-CV-556-JPG, 2012 WL 2520953, at *3 (S.D. Ill. June 27, 2012). Jackson also acknowledges that he is not among the few plaintiffs whose particular combinations of duration and conditions of segregation have already come before this court. Appellant's Br. at 10.

Jackson's acknowledgment that no case has previously considered factual circumstances closely comparable to his confirms defendants' entitlement to qualified immunity.

Jackson's liberty interest was not "clearly established" by the case law of this court or the Supreme Court in March 2020.[6]

On the conditions factor, the conditions Jackson alleges here, though "more severe than those found in the general prison population," are "hardly analogous to a confinement that deprives a prisoner of all human contact or sensory stimuli," *Hardaway*, 734 F.3d at 744, like the conditions the Supreme Court found sufficient to create a liberty interest in *Wilkinson*. And on the duration factor, Jackson has not "presented case law stating that a [three]-month period of confinement under conditions similar to [his] implicates a liberty interest." See *id.*

The closest cases are a handful of non-precedential orders from this court and federal district courts in Illinois that were identified in the district court's order granting summary judgment. See *Jackson*, 2023 WL 319530, at *7, citing *Obriecht v. Raemisch*, 565 F. App'x 535, 540 (7th Cir. 2014) (no liberty interest where defendant "submitted a declaration recounting deplorable conditions (in particular having to sleep on a mattress placed directly on the wet floor)" but was "released from segregation after only 78 days"); *Whitfield v. Atchinson*, No. 13-cv-653-SMY-RJD, 2017 WL 3707180, at *5 (S.D. Ill. Aug. 28, 2017) (no liberty interest where segregation lasted three

---

[6] See *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) ("We look first to controlling Supreme Court precedent and our own circuit decisions on the issue. If no controlling precedent exists, we broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.") (internal quotations and alteration omitted), quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000).

months, with conditions including a steel door, cellmates with mental health issues, unpleasant odors, constant noise, and other inmates throwing feces at him); *McKinley v. Atchison*, No. 3:16-cv-661-NJR-MAB, 2019 WL 4744839, at *7 (S.D. Ill. Sept. 30, 2019) (liberty interest implicated where conditions including mice and cockroach infestation, cracked window, no heat, no hot water, and no cleaning supplies lasted more than three years).

These cases do not defeat qualified immunity here. First, these cases are of limited value in demonstrating that Jackson's liberty interest was "clearly established." See *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) (district court and non-precedential circuit court decisions generally do not clearly establish law). More substantively, even among these non-precedential orders with comparable conditions, Jackson's three-month duration of confinement was closer to *Obriecht* and *Whitfield* in which the courts declined to find liberty interests, than to *McKinley*, where the court did find a liberty interest. Jackson has not identified any case predating his March 2020 adjustment hearing finding a liberty interest in circumstances resembling the three-month duration and deplorable conditions of his segregation at Pontiac. Thus, he fails to overcome the defense of qualified immunity.

\*       \*       \*

Jackson presented evidence showing that he was subjected to three months in appalling conditions of solitary confinement at Pontiac. Taking that evidence as true, Jackson had a liberty interest in avoiding the described conditions, so prison officials should have afforded him due process. Even so, "the Defendants should not be held responsible for incorrectly guessing otherwise due to the ambiguity of the parameters of

the law." *Hardaway*, 734 F.3d at 745. The defendants are therefore entitled to qualified immunity on Jackson's due process claim. Moving forward, such short terms of solitary confinement combined with comparable disgusting conditions will suffice to show a loss of protected liberty requiring procedural protections, as will longer terms of solitary confinement alone.

The judgment of the district court is AFFIRMED.

HAMILTON, *Circuit Judge*, joined by ROVNER, *Circuit Judge*, concurring. In 2015, the United Nations General Assembly unanimously adopted the Standard Minimum Rules for the Treatment of Prisoners, also called the Nelson Mandela Rules. Those rules, which were sponsored by the United States, prohibit as a form of torture solitary confinement of more than fifteen consecutive *days*.[1] Yet federal courts in the United States routinely hold that terms of solitary confinement measured in *years* do not violate the Eighth Amendment prohibition on cruel and unusual punishment. We also find that inmates rarely have a constitutionally protected liberty interest in avoiding such restrictive conditions.

The lead opinion resolves this appeal correctly under current precedent and as the issues were framed for us. I write separately (a) to put this case in a broader context of constitutional law and prison practice, (b) to link procedural treatment of solitary confinement to substantive limits under the Eighth Amendment, and (c) to suggest how our case law under the Eighth and Fourteenth Amendments should develop in future cases. We know that prolonged periods of solitary confinement can have harmful, even devastating, effects on prisoners. Such prolonged punishments may be justified in extreme cases, but they should become much rarer than they are under current law and practice. We should begin bringing our Eighth Amendment law and actual prison practices into

---

[1] See G.A. Res. 70/175, at 15–16 (https://perma.cc/8ZRB-6SA9) (Dec. 17, 2015); U.N. Comm'n on Crime Prevention and Criminal Justice, Mandela Rules, U.N. Doc. E/CN.15/2015/L.6/Rev.1 (https://perma.cc/TBA9-AW7E) (May 21, 2015) (U.N. Commission, including United States, recommending adoption of Mandela Rules).

line with evolving standards of human decency and with the
Nelson Mandela Rules.

I.   *Ineffective Solitary Confinement Case Law*

As explained in the lead opinion, this appeal is framed to
test only whether plaintiff Abre Jackson was entitled to pro-
cedural protections before he was ordered to spend three
months in solitary confinement in filthy, appalling conditions.
E.g., *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (finding lib-
erty interest established and asking what process was due).[2]

The Supreme Court has framed the due process problem
for solitary confinement in two principal cases from a gener-
ation ago, *Sandin v. Conner*, 515 U.S. 472 (1995), and *Wilkinson
v. Austin*, 545 U.S. 209 (2005). *Sandin* held that a prisoner dis-
ciplined with thirty days in solitary confinement was not en-
titled to due process protections because prison officials did

---

[2] Most cases cited in this opinion (like Jackson's appeal) speak in terms
of "segregation." That is a euphemism for solitary confinement. In a typi-
cal "segregation," a prisoner is held in "a windowless cell no larger than
a typical parking spot for 23 hours a day; and in the one hour when he
leaves it, he likely is allowed little or no opportunity for conversation or
interaction with anyone." *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Ken-
nedy, J., concurring); *Wallace v. Baldwin*, 895 F.3d 481, 482–83 (7th Cir.
2018) (noting euphemism and quoting plaintiff describing "segregation"
as "akin to being sealed inside a coffin"). In 2015 and 2016, experts esti-
mated that somewhere between 60,000 and 100,000 prisoners were held in
solitary confinement. Judith Resnik et al., *Punishment in Prison: Constitut-
ing the "Normal" and the "Atypical" in Solitary and Other Forms of Confine-
ment*, 115 Northwestern Univ. L. Rev. 45, 77 (2020); see also *Apodaca v.
Raemisch*, 586 U.S. 931, 935 (2018) (statement of Sotomayor, J., regarding
denial of certiorari) (noting similar statistics). In 2017, almost 2,000 of those
individuals had been in isolation for more than six years. Resnik, *supra*,
115 Northwestern Univ. L. Rev. at 78.

not impose an "atypical and significant hardship" as compared to the "ordinary incidents of prison life." 515 U.S. at 484. *Wilkinson* held that prisoners were entitled to modest procedural protections when they faced transfers for indefinite durations to a "supermax" prison, which would subject them to "extreme isolation," deprive them of "almost any environmental or sensory stimuli," and render them ineligible for parole. 545 U.S. at 214–15. As the lead opinion explains, *Sandin* and *Wilkinson* leave much unclear. In due process cases like this one, the Supreme Court has left it to lower courts to figure out just when the duration and conditions of solitary confinement combine to impose a sufficiently "atypical and significant hardship" to require modest procedural protections. E.g., *Marion v. Columbia Correctional Inst.*, 559 F.3d 693, 696 (7th Cir. 2009).

The *Sandin* standard was adopted in response to problems with a different approach from *Hewitt v. Helms*, 459 U.S. 460 (1983), which focused on the phrasing of prison regulations and policies. The *Sandin* Court wrote that the *Hewitt* standard had encouraged States to give prison officials standardless discretion yet also invited undue federal court intrusion into day-to-day prison management. 515 U.S. at 481–83.

Yet the *Sandin* standard has given rise to its own set of problems. For example, we have not been able to set effective parameters on when a period of solitary confinement is long enough to trigger due process protections regardless of other conditions. See ante at 12–14. Nor have we been able to provide clear guidance on how bad conditions in solitary confinement must be to require procedural protections for shorter durations. See ante at 15–17.

A further debate addresses what procedures are due when a prisoner is punished with solitary confinement. In *Wolff*, the Supreme Court taught that its new standards for depriving a prisoner of good-time credit should also apply to solitary confinement punishments. 418 U.S. at 571 n.19. In *Sandin*, the Court found that the punishment of thirty days in solitary confinement did not entitle the prisoner to "the procedural protections set forth in *Wolff*." 515 U.S. at 487. In *Wilkinson*, however, the Court shifted focus from solitary confinement as an individual punishment to a State's broader practices in deciding which prisoners to assign to its new "supermax" prison. After finding that the assignment would deprive prisoners of a protected liberty interest, the Court held that procedures less formal and adversarial than the *Wolff* procedures would suffice. 545 U.S. at 225–29. We followed that approach in *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012), allowing Illinois to use less formal and adversarial procedures in assigning prisoners to its own "supermax" prison, so long as they received some notice of the reasons for the assignment, an opportunity to respond to them, and a periodic review of their placements.

Judge Scudder points to *Adams v. Reagle*, 91 F.4th 880, 895 (7th Cir. 2024) (majority opinion of St. Eve, J.), where the panel majority, without analysis of the point, extended the informal and non-adversarial *Wilkinson* and *Westefer* procedures for large-scale prison assignments to an individual punishment of many months of solitary confinement. In extending *Wilkinson* and *Westefer* on this point, the *Adams* panel did not address the Supreme Court's different teaching in *Wolff* and *Sandin*. Nor did it engage with our other precedents, including *Kervin*, *Marion*, and *Lisle*, indicating that the more formal

*Wolff* procedures would apply to cases of individual punishment with prolonged solitary confinement.

We have also struggled to explain what it means for a term of solitary confinement to impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. What is an ordinary incident of prison life? Measured by which prisoner? In which prison? We do not know. See, e.g., *Wilkinson*, 545 U.S. at 223 (noting the "difficulty of locating the appropriate baseline"); *Lekas v. Briley*, 405 F.3d 602, 609–10 (7th Cir. 2005) (liberty interest implicated only if inmate's confinement is worse than that authorized in "the most restrictive prison in the state penal system"); *Hardaway v. Meyerhoff*, 734 F.3d 740, 745 (7th Cir. 2013) (quoting plaintiff's brief and agreeing that "there is ambiguity among various Seventh Circuit cases regarding the proper baseline against which to measure conditions of disciplinary confinement") (internal quotation marks omitted).

Judge Scudder's opinion identifies another important problem in these due process claims—calling it a "legal paradox"—albeit one that seems to be baked into the Supreme Court's "atypical and significant hardship" standard from *Sandin*. The problem is that defendant prison officials who order a prisoner into solitary confinement may not be responsible for, and may not even know, the actual conditions of solitary confinement they are imposing. Yet those actual conditions could be decisive under *Sandin*, *Wilkinson*, *Marion*, and similar cases looking at the combination of duration and conditions to determine whether the prison has been deprived of a protected liberty interest. See post at 57. And if a prisoner seeks damages under section 1983 against those officials, he will need to prove that they knew or perhaps should have

known of those conditions. Judge Scudder also calls this "backward" reasoning. Post at 52. There is some merit to that criticism, but again, it is inherent in the due process test of *Sandin* and *Wilkinson*, which teaches us to look at the combination of duration and conditions of the solitary confinement to decide whether a prisoner has been deprived of a protected liberty interest.[3]

---

[3] Another complication in this field is that terms of solitary confinement can be divided into two broad categories: administrative and disciplinary. Administrative segregation is not punitive but is imposed for prison management reasons, such as the safety of the prisoner. Jackson's appeal challenges disciplinary segregation—solitary confinement imposed as punishment for a prison infraction. Some courts have held that when state laws and prison guidelines authorize long terms of administrative segregation, it should be seen as an ordinary and expected condition of incarceration. As a result, administrative segregation raises fewer due process issues. See, e.g., *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) ("Indeed, there is nothing 'atypical' about discretionary segregation; discretionary segregation is instead an 'ordinary incident of prison life' that inmates should expect to experience during their time in prison."); but see *Wilkinson*, 545 U.S. at 224 (administrative assignment to supermax, with indefinite segregation, raised due process issue). Because administrative segregation may be imposed at will, some courts have also held that terms of disciplinary segregation that do not exceed a possible term of administrative segregation do not raise due process issues. E.g., *Sandin*, 515 U.S. at 486.

For clarity, the cases cited in the due process discussion of this opinion deal only with disciplinary segregation unless otherwise noted. But terms of both administrative and disciplinary segregation should pose Eighth Amendment issues, as discussed below. Some inmates have been subjected to unconscionable terms of solitary confinement for administrative reasons. See, e.g., *Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) (affirming denial of qualified immunity when plaintiff was in administrative segregation for 39 years); *Estate of DiMarco v. Wyoming Dep't of Corrections*, 473 F.3d 1334, 1340–41 & n.5 (10th Cir. 2007) (collecting cases finding

This court and other courts have struggled with these problems for decades. We have not yet been able to offer either clear guidance for prison officials or meaningful remedies for prisoners who are subjected to objectively inhumane conditions. Take the narrow question when a term of solitary confinement alone (with otherwise tolerable conditions) can entitle a prisoner to due process protections. We have expressed approval of decisions from other circuits holding that "periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." *Marion*, 559 F.3d at 699 (footnote omitted). In a more recent non-precedential order, we said that eight months was a "duration long enough to implicate a liberty interest…." *Williams v. Brown*, 849 F. App'x 154, 157 (7th Cir. 2021). But we have also held that inmates do *not* have a liberty interest in avoiding up to a year in solitary confinement, at least not without further inquiry into the conditions of confinement. E.g., *Bryan v. Duckworth*, 88 F.3d 431, 433–34 (7th Cir. 1996), abrogated on other grounds, *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998).

Decisions by our colleagues in other circuits are similarly unsettled. As the lead opinion explains, the First and Second Circuits have said that periods of disciplinary solitary confinement exceeding roughly a year presumptively implicate an inmate's due process liberty interest. Ante at 12–13, citing *Perry v. Spencer*, 94 F.4th 136, 159 (1st Cir. 2024) (en banc); *Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000). Other circuits have assumed the same. E.g., *Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996). The Third Circuit, on the

no liberty interest in avoiding terms of administrative segregation lasting up to 1,825 days).

other hand, has said that disciplinary confinement for up to seven months "does not, on its own, violate a protected liberty interest…." *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002). Yet courts still encounter periods of disciplinary solitary confinement longer than two years. See, e.g., *Carrico v. Vanihel*, No. 23-1381, 2023 WL 7015274, at *1 (7th Cir. 2023); *Jackson v. Wexford Health Sources*, No. 15-CV-920-NJR, 2015 WL 6663954, at *8 (S.D. Ill. Nov. 2, 2015) (plaintiff alleged more than five years of disciplinary segregation).

Recall that these durations are not maximum limits on solitary confinement but only the times that trigger minimal procedural protections. Under current law, prison officials may subject inmates to essentially indefinite solitary confinement so long as they have hearings with procedural safeguards as outlined in *Wilkinson* and *Wolff v. McDonnell*, 418 U.S. 539 (1974). Our precedents imply that prison officials may discipline inmates *without any procedural protections* by putting them in "humane" solitary confinement conditions for up to seven months, eight months or even a year, depending on the circuit.

Case law from this circuit and other circuits has generally held that whether intermediate durations of solitary confinement—usually measured in months—implicate liberty interests will depend on the facts of those conditions. See, e.g., *Lisle v. Welborn*, 933 F.3d 705, 721 (7th Cir. 2019) (analyzing conditions of confinement when plaintiff was placed in solitary for four months); *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) (period of solitary shorter than six months may require assessment of conditions, and collecting cases); *Marion*, 559 F.3d at 699 (eight-month term of disciplinary solitary required remand for assessment of conditions); *Mitchell v. Horn*, 318 F.3d

523, 527, 531–33 (3d Cir. 2003) (remanding after prisoner was sentenced to 90 days in disciplinary confinement; cell had "human waste smeared on the walls" and was "infested with flies"); *Gaines v. Stenseng*, 292 F.3d 1222, 1226 (10th Cir. 2002) (remanding for consideration of conditions after 75 days in solitary); *Colon*, 215 F.3d at 232 ("in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days, development of a detailed record will assist appellate review") (footnote omitted). This makes sense in theory. The logic is that prisoners have a greater "liberty" interest in avoiding solitary confinement when they are held in appalling conditions, like those in this case, than when they are held in better conditions. But the upshot of these cases is that inmates have no liberty interest in avoiding solitary confinement so long as the only thing that has changed is the fact that the prisoner is in solitary confinement—even if the prisoner is segregated for months on end.

More troubling, we have explained in non-precedential orders that "short" periods of solitary confinement—including "only 78 days"—do not support due process claims as a matter of law even when the conditions are otherwise "deplorable." See *Obriecht v. Raemisch*, 565 F. App'x 535, 540 (7th Cir. 2014) (no liberty interest where prisoner was placed in segregation for 78 days and made to sleep on mattress on wet floor); *Younger v. Hulick*, 482 F. App'x 157, 159 (7th Cir. 2012) (saying "relatively short" terms of segregation "do not require inquiry into conditions" and collecting cases). These cases suggest that any term of solitary under three months will not implicate a liberty interest as a matter of law—that is, without even considering the condition of the cells (which, as this case makes clear, can be appalling). A review of the authorities cited for this premise in *Obriecht* and *Younger* makes

it seem like these cases reflect a "precedential drift," where sound holdings morph slowly into the untenable and intolerable.

I hope our holding today will stop that drift, making clear that even less prolonged terms of disciplinary confinement warrant judicial attention and procedural protections. Again, under the Nelson Mandela Rules, anything more than fifteen days is prohibited as form of torture or cruel, inhuman, or degrading treatment. It is time to modify and clarify our standards in this area.

## II. *Procedural Obstacles to Progress and the Need for Change*

Until now, change in the law of solitary confinement has been delayed by two barriers to meaningful judicial review: qualified immunity and the very limited availability of injunctive relief. As explained above, whether disciplinary solitary confinement implicates an inmate's liberty interests is a fact-specific inquiry, meaning that qualified immunity will commonly apply. In at least some of those cases, we will exercise our discretion under *Pearson v. Callahan*, 555 U.S. 223, 242 (2009), to bypass merits questions and address only whether the law was clearly established. E.g., *Hardaway*, 734 F.3d at 743–45; *Carrico*, 2023 WL 7015274, at *3. We also rarely have the opportunity to address claims for injunctive relief challenging short-term prison disciplinary practices, which avoid qualified immunity defenses. By the time those cases make it to federal court, the claims for injunctive relief are moot. Cf. *Black v. Brown*, 513 F.2d 652, 655 n.8 (7th Cir. 1975) ("The claim for injunctive relief is, of course, mooted by plaintiff's release from isolation and segregation."); *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019) ("Hamner is no longer in

administrative segregation, and he concedes that his claim for injunctive relief is moot.").[4]

Jackson's case is one of the rare situations where a challenge to a term of disciplinary solitary confinement is properly presented to this court. We correctly exercise our discretion to address the merits issue and to "clarify [constitutional] law in our circuit and establish future constitutional boundaries…," *Smith v. Kind*, 140 F.4th 359, 366 (7th Cir. 2025), but we are still obliged to affirm on the basis of qualified immunity because the facts of Jackson's case—although striking—do not closely resemble facts we have confronted in any previous decision and a constitutional violation is not (yet) obvious on these facts.

Our obligation to grant qualified immunity to the defendants here shows the benefits of a brighter-line rule. We should heed the Supreme Court's warning that punting on a merits question "again, and again, and again" can "frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Camreta v. Greene*, 563 U.S. 692, 706 (2011), quoting *Pearson*, 555 U.S. at 237. The next time this court sees a due-process challenge to a punishment of a year or more in solitary confinement, we should join with the First and Second Circuits in presuming that solitary confinement of a year or more requires due-process protections regardless of the details of prison conditions. See *Perry*, 94 F.4th at 154

---

[4] When punishment is imposed in a prison disciplinary proceeding, a civil challenge under § 1983 also must face the challenge posed by *Heck v. Humphrey*, 512 U.S. 477 (1994) (civil claim that implies invalidity of conviction or sentence not actionable until conviction or sentence has been set aside), and *Edwards v. Balisok*, 520 U.S. 641 (1997) (applying *Heck* to prison discipline).

("the showing can be made when the length of the confine-
ment is as long as" 376 days of administrative segregation);
*Colon*, 215 F.3d at 231 (same for 305 days). In fact, with an eye
on the Nelson Mandela Rules and modern understanding
about the effects of solitary confinement (addressed below), it
would be better and more reasonable to move that boundary
down from a year toward fifteen days.

Drawing such a line in our case law would be helpful for
two reasons. First, an outer boundary would limit prolonged
periods of solitary confinement from falling into a "repetitive
cycle of qualified immunity…." *Camreta*, 563 U.S. at 706 n.5.
Forward-looking rules help safeguard constitutional rights in
many areas of public law, and we should bring that approach
to this doctrine as well. See, e.g., *County of Riverside v.
McLaughlin*, 500 U.S. 44, 56 (1991) (adopting 48-hour standard
for "prompt" probable cause determination by court after ar-
rest); *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966) (requiring
prophylactic measures to safeguard constitutional rights).

Second, for practical reasons due process claims based on
solitary confinement "are an especially appropriate context
for a bright-line approach." *Colon*, 215 F.3d at 233 (opinion of
Newman, J.). Prison officials are entitled to the clearest guid-
ance the courts can provide. Without a clear rule, prison offi-
cials risk avoidable exposure to lawsuits that may or may not
bypass qualified immunity depending on whether the plain-
tiff has suffered conditions that have received prior appellate
attention. As Judge Newman explained in *Colon*:

> This is a context in which a high degree of cer-
> tainty is extremely desirable. Prison officials
> conduct thousands of prisoner hearings each
> year, and they are entitled to know beforehand

whether these hearings are subject to the proce-
dural due process requirements of the Constitu-
tion. It is better to alert these officials to the fed-
erally enforceable requirements that must be
observed than to leave the officials uncertain
and merely afford damage remedies in those
rare cases where courts determine after the fact
both that the conditions were atypical and that
the defendant officials were not entitled to qual-
ified immunity.

*Id.* (footnote omitted). In a footnote, the opinion continued:

[T]the availability of a standard will alert the of-
ficial to the need to provide federally required
procedures in all hearings likely to result in con-
finements of a duration equal to or exceeding
the standard. In this respect, the situation is sim-
ilar to criminal contempt hearings where the
procedural protection of a jury must be pro-
vided if the prosecutor intends to seek a penalty
of more than six months.

*Id.* at 233 n.6, citing *Muniz v. Hoffman*, 422 U.S. 454, 475–76
(1975).

It is both appropriate and prudent for us to set forth pro-
spective guidance on when solitary confinement requires pro-
cedural protections, regardless of aggravating conditions of
confinement. The facts of this case do not lie close enough to
the outer boundary of our case law to justify drawing such a
line today, but we should do so at the next opportunity. If it
takes an en banc decision or a circulation under Circuit Rule
40(e), so be it.

III. *Solitary Confinement and the Eighth Amendment*

This case did not present an Eighth Amendment challenge to Jackson's solitary confinement. That is typical. Many (if not most) challenges to solitary confinement are brought under the due process clause of the Fourteenth Amendment because *Wolff*, *Sandin*, and *Wilkinson* make clear that such lawsuits can sometimes succeed—and because courts have declined to find Eighth Amendment violations resulting from prolonged periods of solitary confinement. E.g., *Isby v. Brown*, 856 F.3d 508, 521–24 (7th Cir. 2017) (no Eighth Amendment claim when prisoner was held in administrative segregation for more than ten years); see also *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 457–58 & nn. 5 & 6 (3d Cir. 2020) (Porter, J., dissenting) (collecting cases: "the Supreme Court has not recognized psychological health, social interaction, or environmental stimulation as basic human needs in the Eighth Amendment context"); *Grissom v. Roberts*, 902 F.3d 1162, 1173–75 (10th Cir. 2018) (affirming summary judgment for defendants on Eighth Amendment claim; qualified immunity where prisoner was in solitary for twenty years).

There have been some outlier cases, of course. See, e.g., *Hutto v. Finney*, 437 U.S. 678, 685–87 (1978) (approving district court's conclusion that punitive isolation combined with particularly heinous conditions violated Eighth Amendment and affirming remedial measures), abrogated on other grounds by *Dep't of Agriculture v. Kirtz*, 601 U.S. 42, 56 (2024). And long-frozen Eighth Amendment doctrine on solitary confinement appears to be slowly thawing as some circuits have started to realize that prolonged solitary confinement is (or, at least, can be) "cruel and unusual." E.g., *Porter*, 974 F.3d at 440–47, 450–51 (finding issue of fact on Eighth Amendment rights

violation based on 33 years in solitary but affirming on qualified immunity); *Porter v. Clarke*, 923 F.3d 348, 355–61 (4th Cir. 2019) (noting changing academic literature on the subject and affirming summary judgment for plaintiffs based on years in solitary confinement). But the weight of authority still holds that an inmate cannot show an Eighth Amendment violation with even a prolonged term of solitary confinement.

We should reconsider whether and when solitary confinement violates the Eighth Amendment. Supreme Court Justices have been calling for such a review for years. See, e.g., *Apodaca v. Raemisch*, 586 U.S. 931 (2018) (statement of Sotomayor, J., regarding denial of certiorari); *Ruiz v. Texas*, 580 U.S. 1191 (2017) (Breyer, J., dissenting from denial of stay of execution); *Davis v. Ayala*, 576 U.S. 257, 287–90 (2015) (Kennedy, J., concurring). We know that solitary confinement causes serious harm, regardless of whether it is imposed as punishment for the crime committed or as a discipline for a prison infraction.

Recent case law, which has found protectable liberty interests implicated by shorter and shorter periods of solitary confinement, reflects a judicial recognition that prolonged punitive solitary confinement should be a thing of the past, or at least much rarer than it is now. But the harm caused by solitary confinement does not change based on the procedures used to impose it, making the due process clause an inadequate (or at least imprecise) safeguard.

Further doctrinal differences between Eighth Amendment law and Fourteenth Amendment law show that we should reconsider the question under the Eighth Amendment. Compare the two questions:

—Eighth Amendment: is this practice consistent with the evolving standards of decency that mark the progress of a maturing society? E.g., *Walton v. Nehls*, 135 F.4th 1070, 1072 (7th Cir. 2025) (explaining that conduct is objectively serious enough to constitute an Eighth Amendment violation if it does not meet this standard), quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)).

—Fourteenth Amendment: does this punishment impose an atypical and significant hardship within the correctional context? E.g., *Wilkinson*, 545 U.S. at 224.

The Fourteenth Amendment procedural question is empirical. It asks us to determine whether conditions of confinement are irregular and extraordinarily harsh as compared to ordinary prison life. Few judges have spent a night in jail or prison. It's easy for us to assume that life in any correctional context is hard, lonely, and isolating, and may commonly come with long periods of solitary confinement—making that punishment seem anything but "atypical." See, e.g., *Sandin*, 515 U.S. at 485 (thirty days in solitary was "punitive" but did not implicate due process because it was not "a dramatic departure from the basic conditions of" the sentence); Judith Resnik et al., *Punishment in Prison: Constituting the "Normal" and the "Atypical" in Solitary and Other Forms of Confinement*, 115 Northwestern Univ. L. Rev. 45, 108 (2020) ("[M]any Fourteenth Amendment opinions take for granted long-term profound isolation as so normal an incident of prison life that no judicial oversight is needed.").

The Eighth Amendment question is more aspirational. It asks us to determine whether we have outgrown practices that we once tolerated. We should take up that question as applied to prolonged solitary confinement. The answer in most circumstances should be yes. To explain, I next outline how prison disciplinary tactics have evolved. I then summarize a small amount of the massive trove of evidence—from history, domestic and international legal sources, and scientific literature—showing that prolonged solitary confinement is inconsistent with evolving standards of decency.

A. *Winnowing Prison Disciplinary Tactics*

For decades, courts have held that some prison disciplinary practices are off the table because they violate the Eighth Amendment. See Resnik, *supra*, 115 Northwestern Univ. L. Rev. at 59–67 (noting that in the 1960s, courts began rejecting the argument that "correctional need" justified prison disciplinary tactics such as strip cells and deprivation of food and water). In *Hutto v. Finney*, the Supreme Court characterized as "cruel, unusual, and unpredictable" several prison disciplinary tactics: (1) lashing prisoners with "a wooden-handled leather strap five feet long and four inches wide;" (2) using a hand-cranked device to "administer electrical shocks to various sensitive parts of an inmate's body;" and (3) giving inmates guns and tasking them with keeping order, resulting in beatings and shootings. 437 U.S. 678, 682 & n.4, n.5, and n.6 (footnotes omitted from first quotation).

In *Furman v. Georgia*, Chief Justice Burger noted that courts found Eighth Amendment violations for "offensive punishments devised without specific authority by prison officials …," citing cases prohibiting whipping and placement of prisoners in freezing isolation cells. 408 U.S. 238, 384 (1972)

(Burger, C.J., dissenting), citing *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968) (whipping), and *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967) (filthy and freezing isolation). In *Hope v. Pelzer*, the Supreme Court famously held that prison officials acted with "obvious cruelty" when they hitched a prisoner to a post "for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous." 536 U.S. 730, 745 (2002). The Supreme Court found it particular notable that this "wanton treatment"—which was "antithetical to human dignity"—was "not done of necessity, but as punishment for prior conduct." *Id.*; see also *Smith v. Kind*, 140 F.4th at 374 (Hamilton, J., dissenting) ("it is obviously unconstitutional to deliberately subject a naked prisoner to temperatures equivalent to and colder than a refrigerator"). Prolonged disciplinary solitary confinement should receive similar treatment to these practices that we have appropriately curtailed in the last century.

The minimal procedures required in extreme cases by *Wolff*, *Sandin*, and *Wilkinson* should not be sufficient to justify prolonged solitary confinement. Historically, attempts to regulate particularly harsh punishments with procedural protections have shown that procedures are not sufficient, leading courts to declare later that the underlying practices are unconstitutional no matter how much process is afforded. Whipping is one example.

For years, Arkansas law and prison guidelines had authorized corporal punishment to "maintain prison discipline or to enforce respect for Penitentiary policies." *Talley v. Stephens*, 247 F. Supp. 683, 687–88 (E.D. Ark. 1965). Courts were hesitant at first to declare the practice unconstitutional, explaining that "prison authorities must be given wide latitude and

discretion in the management and operation of their institutions," *id.* at 686, and that "corporal punishment ha[d] not been viewed historically as a constitutionally forbidden cruel and unusual punishment…." *Id.* at 689. A federal court tried to proceduralize whipping by regulating the maximum number of lashes and the manner of administering lashes: each instance of whipping could not be "excessive" and had to be "inflicted as dispassionately as possible and by responsible people…." *Id.* at 689. These procedures look not so different from the ones we now confront in the solitary confinement context—the duration of the confinement cannot be too long, and the cell itself must be tolerable.

Judicial experimentation with proceduralized whipping did not last long. The abhorrent nature of the punishment and its deleterious effects on prisoners soon proved too great to ignore. In *Jackson v. Bishop*, a case cited many times by the Supreme Court, then-Circuit Judge Blackmun wrote an opinion holding that whippings were a cruel and unusual punishment: "the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess…." 404 F.2d 571, 579 (8th Cir. 1968). Noting that "[r]ules in this area seem often to go unobserved," the Eighth Circuit reasoned that it was impossible to "ascertain the point which would distinguish the permissible from that which is cruel and unusual[.]" *Id.* at 579–80.

Solitary confinement may prove to be a similar example. There is some value to improving procedural protections before prisoners are sent to prolonged terms of solitary confinement. But we should not let procedural issues distract us

(courts, legislatures, and prison officials) from the larger substantive issues, whether as matters of Eighth Amendment law or just sound public policy. Like early court decisions proceduralizing whipping, we may look back on our proceduralized solitary confinement cases as band-aids on a more fundamental problem.

B. *Prolonged Solitary Confinement and Evolving Standards of Human Decency*

That brings me to my final point. There is a strong argument that, in many circumstances, prolonged solitary confinement violates the Eighth Amendment, regardless of the procedures used to impose it.[5]

As noted above, the Supreme Court has explained that the Eighth Amendment prohibits punishments that are "incompatible with the evolving standards of decency that mark the progress of a maturing society…." *Walton*, 135 F.4th at 1072 (internal quotation marks omitted), quoting *Hudson*, 503 U.S. at 10. The "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304 (2002) (internal quotation marks omitted), quoting *Penry v. Lynaugh*, 492

---

[5] The Nelson Mandela Rules say that prisoners should "[i]n no circumstances" be subjected to indefinite solitary confinement or prolonged solitary confinement as a disciplinary sanction. See G.A. Res. 70/175, at 15 (https://perma.cc/8ZRB-6SA9) (Dec. 17, 2015). The Rules define "prolonged solitary confinement" as a period longer than fifteen days. *Id.* at 16. This seems like a sensible approach to me. The sweeping "no circumstances" phrase does not, however, allow for the possible need to place a prisoner in solitary confinement for non-disciplinary reasons, such as if the prisoner is a threat to other inmates or is at high risk of harm from other inmates.

U.S. 302, 331 (1989). When deciding Eighth Amendment issues, the Supreme Court has also considered views from the international community as evidence that "there is a consensus among those who have addressed the issue." See *Atkins*, 536 U.S. at 316 n.21 (prohibiting death penalty for intellectually disabled defendants; noting overwhelming worldwide disapproval of practice); see also, e.g., *Graham v. Florida*, 560 U.S. 48, 80 (2010) (prohibiting life-without-parole sentence for juveniles in non-homicide cases; international practices "not dispositive" but also "not irrelevant") (internal quotation marks omitted), quoting *Enmund v. Florida*, 458 U.S. 782, 796 n.22 (1982).

In the nearly thirty years since *Sandin*, sociological and medical research has laid bare the damaging mental and physical effects of solitary confinement. There is increasing scientific consensus and public awareness that the duration of isolation is itself a "condition" with a heavy bearing on how an inmate experiences confinement. That awareness is reflected in case law. See Alexander N. Reinert, *Solitary Troubles*, 93 Notre Dame L. Rev. 927, 956 & n.163 (2018) (collecting cases and saying the "conceptual resistance" to considering human contact as a basic human need "is breaking down"); see also, e.g., *Davis*, 576 U.S. at 287 (Kennedy, J., concurring) ("The human toll wrought by extended terms of isolation long has been understood …."); *Williams v. Pennsylvania Dep't of Corrections*, 117 F.4th 503, 515–26 & n.98 (3d Cir. 2024) (violation of clearly established law to place mentally ill prisoner in long-term solitary confinement; collecting cases); *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) (finding harm from prolonged solitary confinement obvious in light of "extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that

has emerged in recent years"); *Hamner v. Burls*, 937 F.3d 1171, 1181 (8th Cir. 2019) (Erickson, J., concurring) (recognizing "the developing science of mental health and what is now known [about] the profound detrimental and devastating impact solitary confinement has on an inmate's psyche"); *Palakovic v. Wetzel*, 854 F.3d 209, 225–26 (3d Cir. 2017) (acknowledging "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Kervin*, 787 F.3d at 837 ("The serious psychological consequences of such quasi-solitary confinement have been documented."), citing Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Ind. L. J. 741 (2015).

The arc of American jurisprudence on solitary confinement shows that it has long been understood as a cruel practice. Prolonged solitary confinement was uncommon in the early years of the United States. See David M. Shapiro, *Solitary Confinement in the Young Republic*, 133 Harv. L. Rev. 542, 581 (2019) ("[I]t does not appear that prisoners in the 1790s ever remained in solitary confinement for years on end."). Beginning in the 1820s, a few states experimented with long-term solitary confinement to encourage individual repentance, but "after an initial phase of popularity, [it] came to be rejected by the 1860s because of its cruel effects." John Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev. 39, 56, 61–64 (2019). The Supreme Court capped this rejection with *In re Medley*, 134 U.S. 160 (1890), finding that a state statute requiring a prisoner to remain in solitary confinement for two to four weeks prior to execution "added such significant suffering to his sentence that it could not be imposed on a prisoner whose crime occurred before the statute took effect."

Stinneford, *supra*, 95 Notre Dame L. Rev. at 66, citing *Medley*, 134 U.S. at 168, 172 (noting that several decades ago, "the whole subject attracted the general public attention, and its main feature of solitary confinement was found to be too severe").

As one scholar noted: "The founding nation of the modern prison systems—the United States—was among the first to abandon large-scale solitary confinement." Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Justice 441, 465 (2006). After *Medley*, solitary confinement survived only "at the very margins of penal practice during the twentieth century …." Stinneford, *supra*, 95 Notre Dame L. Rev. at 56. That changed in the 1970s when prison overcrowding, a rise in prison riots, and the highly publicized October 1983 murders of two prison guards resurrected solitary confinement "in the form of the 'supermax' movement in the 1980s and 1990s." *Id.* at 56, 71–72; see also Scharff Smith, *supra*, 34 Crime & Justice at 442–43. Solitary confinement has remained a common practice since then: according to estimates from 2021, at least 41,000 prisoners nationwide were isolated "in a cell for an average of twenty-two hours or more per day, for fifteen or more consecutive days." Correctional Leaders Ass'n & Arthur Liman Ctr. for Pub. Interest at Yale L. School, *Time-in-Cell 2021: A Snapshot of Restrictive Housing*, vii, 60 (2022) (https://perma.cc/KSZ5-EY55); see also *supra* n.2 (providing even higher estimates from the mid-2010s).

In the past decade, a great deal of sociological and scientific evidence of the harms of solitary confinement has

emerged.[6] As I said at the outset, in 2015, the United Nations General Assembly unanimously adopted the Standard Minimum Rules for the Treatment of Prisoners, also called the Nelson Mandela Rules. Those rules prohibit disciplinary solitary confinement of more than fifteen consecutive days as a form of torture. G.A. Res. 70/175, at 15–16 (Dec. 17, 2015).[7] The Mandela Rules accompanied an international decline in the use of prolonged solitary confinement. Although each jurisdiction's laws are subject to certain nuances and exceptions,

---

[6] The following is a small sample of recent work. Bruce Western et al., *Solitary Confinement and Institutional Harm*, 3 Incarceration 1, 20 (2022) (collecting empirical support for the premise that solitary confinement degrades human dignity); Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Northwestern Univ. L. Rev. 211 (2020) (collecting research); Justin D. Strong et al., *The Body in Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement*, 15 PLoS One 10 (2020); Mimosa Luigi et al., *Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings*, 11 Frontiers in Psychiatry 840 (2020). Slightly older work includes Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Academy Psychiatry & L. 104, 104 (2010) ("("[I]solation can be as clinically distressing as physical torture."); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Policy 325 (2006); and Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Social Change 477 (1997).

[7] On the State Department's involvement, see Dan Sicorsky, *The Nelson Mandela Rules: Honoring a Prisoner Turned World Leader*, U.S. Dep't of State, July 18, 2017 (https://perma.cc/D4Y8-C3N3) ("A partnership between the State Department and Colorado Department of Corrections has trained 1,050 corrections professionals from more than 20 countries in the operation of humane and transparent prisons.").

the following nations and provinces have broadly limited the disciplinary use of solitary confinement:

- Brazil, Croatia, France, Japan, Peru, Switzerland, and Western Australia (maximum of thirty days)
- Albania, Belgium, Colombia, Croatia, the Netherlands, Sri Lanka, Venezuela, Italy, Yukon, Canada, Serbia, and Spain (fourteen or fifteen days)
- Chile, Bolivia, and Romania (ten days)
- Israel (seven days)
- Ireland and Scotland (three days)

Sharon Shalev, *Mapping Solitary Confinement*, 7–8 (2024) (outlining survey and noting that laws varied slightly depending on various factors including inmate's age, severity of offense, and sentence length); see also *id.* at 17–21 (surveying international use of solitary as prison management and inmate-protection tool).

That trend has also taken effect domestically. Between 2009 and 2022, 886 bills were introduced in 45 states to restrict or end solitary confinement. Forty states passed at least one of those bills. Unlock The Box, *Banning Torture: Legislative Trends and Policy Solutions for Restricting and Ending Solitary Confinement throughout the United States* 4 (2023) (https://perma.cc/8VRM-VLKM). New Jersey, for instance, has statutorily limited the use of solitary confinement to twenty consecutive days, subject to limited exceptions. See N.J. Rev. Stat. § 30:4-82.8(a)(9) (2025). Prison administrators have also made reforms in this direction. In 2017, the executive director of Colorado's Department of Corrections ended the state's use of long-term solitary confinement beyond the

Nelson Mandela Rules' limit of fifteen days, which he had helped draft.[8] A sitting president has called for the curtailment of solitary confinement,[9] and in testimony to a House Appropriations Subcommittee, so has a sitting Supreme Court justice.[10]

---

[8] See Rick Raemisch, Opinion, *Why We Ended Long-Term Solitary Confinement in Colorado*, N.Y. Times (Oct. 12, 2017), https://www.ny-times.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html (last accessed July 23, 2025); see also Amy Fettig, *Why I Worked on the Mandela Rules*, *in* Incarceration and the Law: Cases and Materials 225, 225–26 (Margo Schlanger et al. ed., 10th ed. 2020) (https://perma.cc/44W6-B7FB) ("At an early meeting, the U.S. government actually opposed any meaningful limits on solitary confinement," but "this dynamic changed after U.S. advocates were able to bring to the negotiating table two state corrections directors from Colorado and Washington who pioneered reforms of solitary confinement in their own jurisdictions.").

As another example North Dakota derived inspiration from Norwegian practices and implemented dramatic reforms resulting in a 74% reduction in the use of solitary confinement between 2016 and 2020. See David Cloud, et al., *"We just needed to open the door": a case study of the quest to end solitary confinement in North Dakota*, 9 Health & Justice 28 (2021).

[9] Barack Obama, Opinion, *Why We Must Rethink Solitary Confinement*, Wash. Post (Jan. 25, 2016), https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html (last accessed July 23, 2025) (announcing executive directive "banning solitary confinement for juveniles" in federal prisons); The White House, Fact Sheet: Dep't of Justice Review of Solitary Confinement (January 25, 2016) (https://perma.cc/3RDJ-K24A) (explaining presidential guidance).

[10] Amy Fettig & Samuel Weiss, *Supreme Court Justice Kennedy Invites Constitutional Challenge of Solitary Confinement*, Solitary Watch (June 23, 2015) (https://perma.cc/SQ7J-NCMQ) (last accessed July 23, 2025) (Justice

I do not mean to imply bad faith on the part of prison officials, who have very difficult jobs. See, e.g., *Wilkinson*, 545 U.S. at 227 (acknowledging "the brutal reality of prison gangs"). My point is that our confusing case law on solitary confinement is not helpful to prison officials, not fair to prisoners, and not consistent with the Nelson Mandela Rules or "the evolving standards of decency that mark the progress of a maturing society." *Hudson*, 503 U.S. at 10.

Today's decision applies governing law correctly and, recognizing the difficult situation that prison officials face, appropriately grants qualified immunity. In the longer run, however, even more specific guidance on procedures for disciplinary solitary confinement will not adequately address the harms caused by prolonged solitary confinement, which do not depend on the procedures used to impose it. We should reconsider our application of the Eighth Amendment to prolonged disciplinary solitary confinement, which should no longer be such a common feature of imprisonment.

---

Kennedy telling Congress that "[s]olitary confinement literally drives men mad").

SCUDDER, *Circuit Judge*, concurring in the judgment. Today's decision is a postcard example of a court getting ahead of itself. The majority opinion forgoes a narrow and straightforward resolution of this appeal—on qualified immunity grounds—and reaches to resolve a much broader, much more complicated, and much more consequential issue of when a prisoner's transfer to segregated confinement warrants constitutional protections. More concerning yet, the majority announces a standard at odds with our case law and far afield from Supreme Court precedent. So I am left only to concur in today's judgment.

**I**

Do not let the length and density of the majority or separate concurring opinion distract from what happened here and the ease of resolving the issue presented on qualified immunity grounds.

Following a hearing, Illinois prison officials ordered Abre Jackson to serve 90 days in segregated confinement as disciplinary punishment for an incident at the Stateville Correctional Center. Everyone agrees that Jackson had a full opportunity at the hearing to tell his side of the story and to ask questions of the prison officials. Jackson nonetheless invokes the Fourteenth Amendment's Due Process Clause and claims he was owed more process—the right to review video evidence of the incident and to cross-examine correctional officer witnesses.

Our recent decision in *Adams v. Reagle* defeats Jackson's claim. "Our law is clear," we explained, "that an inmate who is facing transfer to disciplinary segregation is entitled only to 'informal, nonadversarial due process,'" meaning "notice of

the reasons for the inmate's placement and 'an opportunity to present his views.'" *Adams v. Reagle*, 91 F.4th 880, 895 (7th Cir. 2024) (majority opinion of St. Eve, J.) (quoting *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012)). That informal process does not include the right to call witnesses or review video evidence, however. See *id.*; see also *Westefer*, 682 F.3d at 685 (explaining that "inmates do not have a constitutional right to call witnesses").

*Adams* is not an aberration. To the contrary, it aligns with direction from the Supreme Court. The Court rejected a nearly identical due process claim two decades ago when a group of inmates challenged the procedures that preceded their indefinite transfer to Ohio's Supermax facility. See *Wilkinson v. Austin*, 545 U.S. 209, 225–28 (2005). The Court found no procedural due process violation where the inmates "receive[d] notice of the factual basis" for the transfer and "a fair opportunity for rebuttal at a hearing," although they could not call witnesses. *Id.* at 225–26, 228. That is exactly the process Jackson received here: notice and an opportunity to be heard.

Regardless, the qualified immunity inquiry is not close. At the time of Jackson's disciplinary hearing, neither our court nor the Supreme Court had ever held that due process requires that an inmate be allowed to call witnesses or review documentary or video evidence prior to their placement in disciplinary segregated confinement.

This is all we had to say to resolve Jackson's appeal.

## II

The majority charts a different course by seeing Jackson's case as an opportunity to explore constitutional limits on the duration of segregated confinement. It is from that

perspective that the majority chooses to break new ground and announce a broad and unworkable rule of constitutional law—all purportedly in the name of procedural due process.

## A

Jackson's appeal should never have become a test case. He experienced a relatively short period of disciplinary segregation. And his procedural due process claim makes very little sense: he points to the conditions of his segregated confinement and says those conditions proved so horrific that they should have informed the procedures afforded him in the first instance at the disciplinary hearing that led to the segregated confinement. If that reasoning seems backward, that is the correct reaction.

Jackson's position fares worse when measured against our precedent. Even the most cursory review of our cases shows that his challenge to his three-month term of disciplinary segregation cannot rise to the level of a protected liberty interest:

- In *Lekas v. Briley*, the case perhaps most analogous to this one, we declined to find a protected liberty interest where an inmate received three months of segregated confinement which included a loss of work and programming privileges, no telephone usage or contact visits, and reduced access to personal items and the commissary. 405 F.3d 602, 610 (7th Cir. 2005). We analogized the conditions in *Lekas* to *Williams v. Ramos*, 71 F.3d 1246 (7th Cir. 1995), where the prisoner experienced solitary confinement for 19 days, and *Thomas v. Ramos*, 130 F.3d 754 (7th

Cir. 1997), where the prisoner's 24-hour-a-day segregation lasted for approximately 70 days. In neither case did we identify a protected liberty interest. *Id.* at 762; *Williams*, 71 F.3d at 1250.

- In *Ealy v. Watson*, we considered a procedural due process claim where the plaintiff spent five months in segregation and experienced "cold temperatures, dirty cells, and faulty plumbing resulting in unsanitary conditions." 109 F.4th 958, 961 (7th Cir. 2024). The majority quotes from *Ealy* at great length, but its reliance misses the mark. There we declined to find a protected liberty interest, instead taking the more obvious route and holding that there was no due process violation—leaving the liberty question unanswered. See *id.* at 965. But in past cases where we did reach the liberty question, we made clear the bar is high. We failed to identify a liberty interest in *Lisle v. Welborn*, for example, where the prisoner challenged his four-month term of segregated confinement in a cell with "rust on the bars and 'corroded feces' in the toilet." 933 F.3d 705, 721 (7th Cir. 2019) (explaining that a jury could not reasonably infer "that these conditions caused Lisle any significant hardship").

- As support for the very brief discussion of unsanitary conditions in *Ealy* and *Lisle*, we cited our earlier decision in *Kervin v. Barnes*,

787 F.3d 833 (7th Cir. 2019). See *Ealy*, 109 F.4th at 965; *Lisle,* 933 F.3d at 721. Yet we declined to find a protected liberty interest in *Kervin*, where the prisoner endured 30 days in segregated confinement and lost telephone and commissary privileges. See *id.* at 834, 837. In reaching that conclusion, however, we described it as "sensibl[e]" that "the severity of treatment should be combined with its duration in assessing the gravity of the conditions complained of by the prisoner." *Id.* at 836 (citing out-of-circuit cases considering "unsanitary or otherwise disgusting" conditions in the context of a liberty interest analysis).

- And in at least four cases where an inmate experienced a period of segregated confinement lasting anywhere between six months and one year, we remanded for further factual development on whether the conditions of segregated confinement were sufficiently "atypical" to establish a liberty interest. See, *e.g.*, *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698–99 (7th Cir. 2009); *Wagner v. Hanks*, 128 F.3d 1173, 1174, 1177 (7th Cir. 1997); *Bryan v. Duckworth*, 88 F.3d 431, 433 (7th Cir. 1996); *Whitford v. Boglino,* 63 F.3d 527, 533 (7th Cir. 1995).

Right to it, we have never held that three months of segregated confinement constitutes a significant and atypical hardship. Nor have we ever found that unsanitary conditions

within a term of segregated confinement have sufficed to establish a protected liberty interest. Indeed, we have "described an inmate's liberty interest in avoiding segregation as very limited or even nonexistent." *Marion*, 559 F.3d at 697; see *Wagner*, 128 F.3d at 1175 (describing "the right to litigate disciplinary confinements" as "vanishingly small").

Nothing improves for Jackson if the focus turns to the U.S. Reports. The Supreme Court has provided guidance in two cases occupying opposite ends of the spectrum. In *Sandin v. Conner*, the Court found no liberty interest where the inmate served 30 days in disciplinary segregation because the conditions in segregated confinement "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." 515 U.S. 472, 486 (1995).

Ten years later in *Wilkinson v. Austin*, the Court encountered facts on the opposite end of the spectrum. There a group of inmates challenged their transfers to Ohio's Supermax facility which had "more restrictive [conditions] than any other form of incarceration in Ohio," depriving inmates "of almost any environmental or sensory stimuli and of almost all human contact." 545 U.S. at 214. Subjecting Ohio prisoners to these "harsh conditions" for years on end amounted to an "atypical and significant hardship," resulting in a protected liberty interest for purposes of a procedural due process claim. *Id.* at 224.

To my eye, Jackson's term in segregated confinement falls much closer to the conditions described in *Sandin* than it does *Wilkinson*. Jackson's commitment to disciplinary segregation was not unlimited in duration: he received three months as punishment which is similar to the one-month term of segregation in *Sandin*, and far shorter in duration than *Wilkinson*,

where an inmate's placement in the Supermax was subject only to an annual review. See *id.* Even if I am mistaken, nothing in *Sandin* or *Wilkinson* comes anywhere close to suggesting a violation of Jackson's procedural due process rights at his disciplinary hearing.

The majority's reliance on *Taylor v. Riojas* is most confusing. *Riojas* is an Eighth Amendment case—a conditions of confinement case—where prison officials placed Texas inmate Trent Taylor in an extremely unsanitary cell covered "nearly floor to ceiling in '"massive amounts" of feces.'" 592 U.S. 7, 8 (2020). Taylor refused food and water for four days due to fear of contamination and was left to "sleep naked in sewage" on his cell floor. *Id.*

The Court's summary reversal of a grant of qualified immunity in *Taylor* "reinforced the principle that prison officials do not have unlimited discretion to confine inmates in deplorable conditions." Op. at 16. But the conditions alleged by Jackson fall short of those experienced by Taylor. Regardless, *Riojas* is through and through an Eighth Amendment case, with the Justices saying not a word about procedural due process. But perhaps that is the aim of today's majority opinion—to somehow force fit an Eighth Amendment claim into a due process mold.

B

Today's decision is a legal paradox. Remember Abre Jackson's actual claim: he sued the prison officials who conducted his disciplinary hearing, contending they deprived him of a protected liberty interest without due process. His claim is all about the process he received at the disciplinary hearing—he believes he should have been able to call additional witnesses

and review Stateville video evidence. But Jackson has never alleged that the officials who presided over his hearing were aware of the unsanitary conditions he came to experience in the segregation unit. If the hearing officials were not aware of the conditions, how could they have accounted for them in evaluating what process Jackson was due at the disciplinary hearing?

By relying on Jackson's allegations about the conditions of the segregation unit to find a protected liberty interest, the majority essentially conflates an Eighth Amendment conditions of confinement analysis with a Fourteenth Amendment procedural due process claim. It is far from clear to me, as a practical matter, what the difference would be after today's decision. We will now be using the Due Process Clause to assess prison conditions unknown at the time prison officials decide that misconduct warrants a term of disciplinary segregated confinement. And how this will work in practice is anyone's guess.

Do not misread what I am saying. To be sure, in *Wilkinson* the Supreme Court considered the "conditions of confinement" at the Supermax facility in assessing whether the inmates had "a liberty interest in avoiding transfer" to those "more adverse conditions." 545 U.S. at 221–22. But the Court in *Wilkinson* was not licensing courts to consider the full range of conditions that might support an Eighth Amendment claim when assessing whether segregated confinement gives rise to a protected liberty interest under the Fourteenth Amendment's Due Process Clause. Instead, the Court focused solely on conditions that would accompany a prisoner's transfer to a Supermax facility—lack of all human contact, undimmed lights, and limited exercise—all conditions which would have

been known to prison officials at the time of the transfer determination. See *id.* at 223–24; see also *Lisle*, 933 F.3d at 721 ("[I]f the *disciplinary measures* do not 'substantially worsen the conditions of confinement' of an inmate, then he has not been deprived of a protected liberty interest." (emphasis added) (quoting *Miller v. Dobier*, 634 F.3d 412, 414–15 (7th Cir. 2011))).

Go back to Jackson's claim once again. Jackson complained about three aspects of his segregated confinement: loud and unruly inmates in his unit, unsanitary cell and shower conditions, and contaminated water. While we accept these allegations as true, Jackson's observations about the conditions in segregation do not automatically lend support to his procedural due process claim. The question is whether the hearing officers knew of these conditions—the same way the conditions accompanying the Ohio Supermax program were known in *Wilkinson*.

I am not doubting that there may be instances where an inmate adequately alleges that prison officials presiding over disciplinary hearing were on notice that segregated confinement included certain conditions, beyond the obvious loss of privileges it entails, that "impose[d] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. That is not this case, though.

After considering how the majority's test would apply to the facts of Jackson's claim, I am left to wonder whether the whole point of today's decision is to make procedural due process coterminous with the protections afforded by the Eighth Amendment. Is the majority suggesting that deplorable prison conditions, known or unknown at the time of a disciplinary hearing, mean that prisoners must receive mini

trials prior to being housed in segregated confinement? If so, that conclusion will work a sea change in today's law for prison officials conducting routine disciplinary hearings that end with terms of segregated confinement. And I see no way that *Adams v. Reagle* would remain good law in such a regime.

The majority's approach becomes all the more confounding when you compare it against well-established Eighth Amendment principles. In that context, a prisoner must demonstrate that the prison official "k[new] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). But the majority enforces no similar knowledge requirement with respect to the prison officials who conducted Jackson's disciplinary hearing. So the majority's error today is at least two-fold: it applies an Eighth Amendment gloss to our analysis of procedural due process claims, while simultaneously lowering the standard that ordinarily governs claims challenging an inmate's conditions of confinement. In its attempt to craft a bright-line rule, I worry that the majority's decision will wreak havoc within routine disciplinary proceedings that happen all day, every day in federal and state prisons across the country.

We could have easily avoided all of this by assuming Jackson's liberty interest and resolving this case in a few pages because, by any fair measure, Jackson received adequate process. And, at the very least, the defendants have qualified immunity.

### III

The majority's desire to see more development in the law defining the limits of segregated confinement is a view I

share. And I also believe that in time the law can learn much from social science research informing the effects of prolonged solitary confinement.

But this case—brought only in the name of procedural due process and not under the Eighth Amendment—saves those difficult questions for another day. Instead of exercising caution, today's decision reaches to draw legal lines divorced from current law and with no prospect of sound practical implementation. In my respectful view, judicial restraint should have defined our path here.